## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 12 B 23916 |
| | ) | |
| K&K HOLDINGS, LLC, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Judge Pamela S. Hollis |

### MEMORANDUM OPINION

This matter comes before the court on the confirmation of K&K Holdings, LLC's amended plan of reorganization, as modified on July 17, 2013 (the "Plan"). K&K seeks to confirm its plan over the objection of the one secured creditor with which it has not reached a compromise, Inland Bank. The gist of Inland Bank's objections is that the plan is not feasible, and that it is not fair and equitable with respect to its treatment of Inland.

The court held a two day evidentiary hearing at which it heard testimony from witnesses, including two experts, and received exhibits into evidence. The parties filed post-hearing briefs. The court has considered all of the evidence as well as the arguments in the briefs and in open court, and for the reasons stated below, declines to confirm K&K's plan.

### JURISDICTION

This court has jurisdiction under 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. 157(b)(2)(L).

### FINDINGS OF FACT

Frank Kaldis and John Karagiannis founded K&K Holdings, LLC when they purchased their first piece of real estate in 1999. 8/29 Tr. 146.[1] They are each a 50% owner of the

---

[1] Citations in the format "8/29 Tr. ___" or "8/30 Tr. ___" refer to the transcripts of the hearings held on August 29 and August 30, 2013.

membership interests in the LLC. Kaldis also works as an employee for the LLC, earning an annual salary of $117,000.

On April 12, 2012, K&K filed for relief under Chapter 11 of the Bankruptcy Code in the Eastern District of Wisconsin. 8/29 Tr. 15. U.S. Bankruptcy Judge Pamela Pepper transferred K&K's bankruptcy case to this court on June 5, 2012. EOD 1 and 3.

Although four related K&K entities originally filed Chapter 11 petitions, the other three cases were dismissed after the debtors reached agreements with their secured creditors. 8/29 Tr. 15-16.

When K&K filed the instant case, it owned 16 pieces of real estate. EOD 3. The vacancy rate in these commercial buildings had been close to 75% as recently as 2011. 8/29 Tr. 16-17. Although K&K had hoped to retain all the properties through reorganization, 8/29 Tr. 147, it eventually reached agreements with its lenders to return most of them, leaving only five pieces of real estate in this bankruptcy case:

> 215-217 S. Northwest Highway, Barrington, Illinois
>
> 800 S. Northwest Highway, Barrington, Illinois
>
> 523-527 Old Northwest Highway, Barrington, Illinois[2]
>
> 1050 Busse Highway, Bensenville, Illinois
>
> 5439 Durand Avenue, Racine, Wisconsin

Inland Bank is the secured creditor for those five properties. 8/29 Tr. 18 (the "Inland Properties"). K&K manages the Inland Properties itself, and also manages two buildings owned by a related entity which are not property of this bankruptcy estate. 8/29 Tr. 14-15. At the time

---

[2] This property is an office condominium complex. K&K owns all of the units except two. 8/29 Tr. 65.

of the confirmation hearing, the occupancy rate at the Inland Properties was about 58%.[3]  8/29

Tr. 20.

Three of the Inland Properties are located in downtown Barrington, Illinois. "Barrington

has seen a slump in real estate, like everybody else, but things are starting to look up a little bit."

8/29 Tr. 18 line 25 – 8/29 Tr. 19 line 2.  Most of the tenants in the Barrington buildings have

been there for many years. "So they really like it. They're usually local. They live near the area.

Seem to have a good clientele."  8/29 Tr. 20 lines 1-3.

Joyce Spoerlein is the property manager for K&K.  She has more than 35 years of real

estate experience.  In her role at K&K, Spoerlein runs the day to day operations.

> I have a direct contact with all the tenants. I do lease negotiations. I prepare new
> leases. We have a form lease, and I modify those leases. I make recommendations
> on the term for renewals. I prepare budgets. I prepare all kinds of management
> reports. I've been doing the bankruptcy reports. I oversee a building engineer who
> does our in-house work that we need to have performed, you know, daily-type
> tasks.
>
> 8/29 Tr. 13 lines 17-25.

All of K&K's revenues come from rent and CAM (Common Area Maintenance) charges.

8/29 Tr. 39.  Some of the tenants pay estimated CAM charges on a monthly basis.  All of the

tenants "true up" with regard to CAM charges at the end of the year, after K&K reconciles the

amount paid with the actual amount due.  8/29 Tr. 22-23.  As of the trial date, K&K had not

completed its CAM reconciliation for 2012, but it planned to do so within 30 or 40 days.  8/29

Tr. 24.

Four tenants left K&K's Inland Properties while the bankruptcy case was pending.  8/29

Tr. 34-36, 83-84.  All of the tenants left for reasons that "had nothing to do with the location of

---

[3] K&K's witness testified that "our **vacancy** rate with the Inland Properties is about 58 percent right now."  8/29 Tr.
20, lines 18-19 (emphasis added).  In fact, she meant the **occupancy** rate was about 58 percent, although it is
actually slightly lower.  K&K included the two condominium units that it does not own at 523 Old Northwest
Highway in its occupancy calculation.  8/29 Tr. 67.

the properties, the properties themselves, the maintenance." 8/29 Tr. 35, line 25 – 8/29 Tr. 36,

line 2.

Eleven tenants signed renewals while the bankruptcy case was pending. Five renewed at

the same or nearly identical rent, one renewed with a slight increase and five renewed at a

decreased rate:

| Tenant | Transaction |
|---|---|
| Terrace Realty | Renewed from 12/1/2012 - 1/30-2013 at same rent |
| Richard Feare | Renewed from 9/1/2012 – 8/31/2013 at nearly identical rent ($0.05 annual decrease) |
| Van Ness | Renewed from 1/1/2013 – 12/31/2017 at annual decrease of $9,365.96 |
| Barrie Hinman | Renewed from 1/1/2013 – 12/31/2013 at annual decrease of $4,270.26 |
| Huntington Resource | Renewed from 11/1/2012 – 10/31/2013 at annual increase of $603 |
| Ratner Companies | Renewed from 2/1/2013 – 1/31/2015 at same rent |
| X-Change Dialysis | Renewed from 1/1/2013 – 12/31/2013 at same rent |
| Quest Diagnostics | Renewed from 2/1/2013 – 1/31/2014 at annual decrease of $46,363.19 |
| Leader International | Renewed from 6/1/2012 – 5/31/2014 at annual decrease of $2,941.50 |
| China Container | Renewed from 7/1/2012 – 6/30/2013 and again from 7/1/2013 to 12/31/2013 at same rent. In discussions to expand. 8/29 Tr. 82. |
| Stifel, Nicholas | Renewed from 6/1/2013 – 5/31/2018 at lower rent |

8/29 Tr. 69-83, 89-90; Inland Ex. 10. "I saw a trend in which lease rates where [sic] either –

they were coming down. Tenants were paying less or on a per-square-foot basis the rent

decreased." 8/30 Tr. 341, lines 5-8.

Annual lost rent from tenants who left the Inland Properties during the bankruptcy case is

approximately $246,000 and decreased annual rent from renewals at a lower rate is

approximately $62,000, resulting in a total annual base rent decrease of at least $308,000.

Q:    And, in fact, there should be a little bit more added to that because Stifel,
Nicholas reduced about $8,000 a year, right?

A:    Yes.

Q:    So it's something like 316.

[4]

8/29 Tr. 91, lines 17-21.

Four new tenants signed leases during the case. 8/29 Tr. 36-37, 84-86. These new tenants contribute approximately $185,000 per year in annual base rent. 8/29 Tr. 91-92. K&K also made a proposal to one tenant for her to expand into an additional suite at a rental rate of just under $1,000/month, beginning October 1, 2013. 8/29 Tr. 38. No other tenants are planning to expand. 8/29 Tr. 39.

Eight leases at the Inland Properties are due to expire in 2013. 8/29 Tr. 30. Of the tenants at the Inland Properties, only six have leases that extend beyond 2016, and only one has a lease that extends through the life of K&K's proposed ten year plan. 8/29 Tr. 189.

While the Chapter 11 case has been pending, K&K suffered a net loss in annual base rent of approximately $131,000 at the Inland Properties. 8/29 Tr. 92. Kaldis frankly admitted that the commercial leasing market has been "[b]rutal, but is has been improving . . . the positive with all that is the new tenants that we signed have been relatively market, while the preceding years, 2012, 2011, you had to give – allow more abatement, you know, reduced rent, if you will, and so forth." 8/29 Tr. 152, lines 2 – 8.

The largest tenant at any of the Inland Properties is Quest Diagnostics, which pays an annual base rent of approximately $340,000, an amount equal to about one-fifth of total Inland Properties revenue. 8/29 Tr. 185. Quest had been paying approximately $4,200 in miscellaneous rent in addition to base rent, and in 2012 approached K&K about getting a credit for that miscellaneous rent on the grounds that it was being overcharged for CAM. At the same time, Quest's lease was coming up for renewal. The parties eventually came to terms on a one year renewal, and K&K agreed to give Quest a credit in the amount of $134,066.25, which represents that overcharge. 8/29 Tr. 179-184. That one year renewal terms ends on January 31,

[5]

2014. Although Quest's broker had approached K&K about renewal terms and verbally

committed to at least one more year, there was nothing in writing between the parties regarding a

lease renewal at the time of the evidentiary hearing. 8/29 Tr. 94, 184-185.

  Spoerlein updated K&K's budget a few weeks before trial. 8/29 Tr. 27, 41; K&K Ex. 1.

Annual net cash flow in 2014, according to her projections, will be $29,227 on total revenue of

$1,570,227, and in 2015 it will decline to $28,553 at the same revenue. Kaldis reviewed her

budget, but had no comments. 8/29 Tr. 158. Spoerlein generally based her expense amounts for

2013 on actual expenses for 2012 and the first half of 2013. 8/29 Tr. 41-44. For 2014, she

simply increased expenses by three percent because "[t]hat's pretty much what we've been

seeing across the board over the last couple years, is a three percent increase." 8/29 Tr. 49, lines

5-7.

  Income remained the same in her budget from 2013 to 2014, even though some of the

tenants have stepped-up rents at the anniversary of their lease signing. 8/29 Tr. 49-50. She

ignored those step-ups "because there are other times when we renew some of these tenants as is,

or sometimes they would like a little bit of a reduction in rent." 8/29 Tr. 51, lines 9-12.

Spoerlein figured it would be a wash, acknowledging the fact that "there's been such a change,

unfortunately, as far as landlords go. We're having to give a lot more concessions. There's

more properties out there for tenants to choose, so we need to give them some incentive to

renew." 8/29 Tr. 52, lines 14–19. On the other hand, Spoerlein observed that activity picked up

in August, when she signed three new leases. She is optimistic that the stagnant period of the

last two and a half years is ending and that business is increasing. 8/29 Tr. 55.

  Spoerlein did not include in her budget the "true-ups" that K&K expects to receive when

the CAM reconciliation is completed for 2012 and 2013. She estimates 2012 CAM collections

will be $65,000, which was the amount collected in 2011. 8/29 Tr. 113; 119. Kaldis agrees with her estimate. 8/29 Tr. 151.

Real estate taxes increased by $40,000 at 1050 Busse Highway, although that expense is shifted to the tenants in arrears after the CAM reconciliation each year. 8/29 Tr. 45. Spoerlein initially expressed some confusion over whether the entire tax bill is paid by the tenants through CAM when only a portion of the building is occupied.

> THE COURT: So if you had two tenants in the building and you had a $35 to $40,000 property [tax] increase, you're telling me those two tenants would absorb that cost?
>
> THE WITNESS: Yes.
>
> THE COURT: Are you sure about that? I mean, you said I believe.
>
> THE WITNESS: Well, I'm pretty sure.
>
> THE COURT: Okay.
>
> THE WITNESS: Then let me say no.
>
> THE COURT: I --
>
> THE WITNESS: Then I'm not sure. I understand what you're asking.

8/29 Tr. 46, line 14 – 8/29 Tr. 47, line 1. Later in the hearing, Spoerlein clarified that each tenant would reimburse K&K "based on their proportional amount. We will not get complete reimbursement, Your Honor." 8/29 Tr. 114.

Spoerlein included only one potential future tenant in her budget. She expects MB Financial to have signed a lease by October 2013, for occupancy at 1050 Busse in November 2013. 8/29 Tr. 52-54. Rental income from any new tenants would go straight to the bottom line. 8/29 Tr. 54. MB Financial's proposed lease, however, includes an abatement of one month's rent for each year of the lease term. 8/29 Tr. 80.

Spoerlein's budget includes no line item for tenant improvements or build-outs. 8/29 Tr. 95. Spoerlein testified that if a tenant renews for three years, K&K might offer to shampoo the

carpet and paint at a cost of approximately $1.25 per square foot. With a five year renewal, K&K might replace the carpet and paint. 8/29 Tr. 99, 134-35.

Similar improvement costs are associated with a new tenant, although there is no line item for this in the budget. 8/29 Tr. 133. The costs for a new tenant would be significantly higher than for a renewal, as that tenant might need "a couple of offices built or something that effect." 8/29 Tr. 134 lines 3-5. But Spoerlein indicated that following industry practice, K&K would build that cost "into the rental rate and . . . amortize it over the term of the lease. We will pay the cost up front, but we get that – we recoup that money through the term of the lease." 8/29 Tr. 139 lines 1-4; see 8/29 Tr. 156.

Spoerlein's budget did not include a line item for capital expenses, which are ordinarily described as replacement reserves. 8/29 Tr. 95. This includes items such as parking lot repairs,[4] which occurred this year at 1050 Busse and cost approximately $3,000. 8/29 Tr. 100. Spoerlein did not include capital expenses in the budget because K&K did not intend to use its operating account for those items but instead would rely on the $365,000 it currently holds in a reserve account. 8/29 Tr. 95. The reserve account would be used to fund tenant improvements as well. 8/29 Tr. 153-54.

This reserve account accumulated cash from the petition date through October 2012 during which time period K&K made no payments to Inland. 8/29 Tr. 112; **K&K Ex. 3** at 113, 173. As of September 1, 2013, the reserve account balance was $350,394. EOD 291. According to the Monthly Operating Report filed on January 12, 2014, the ending cash balance in the account on December 31, 2013 was $238,808.53. EOD 298.

---

[4] The court takes judicial notice of the Monthly Operating Report filed on December 12, 2013, in which K&K listed a disbursement for 1050 Busse in the amount of $14,003 to Swenson Sealcoat, Inc. for "parking lot repairs sealcoating." EOD 297.

The funds in the reserve account would also be used to pay leasing commissions, which are not accounted for in Spoerlein's budget. 8/29 Tr. 96. Renewing tenants rarely use brokers at the Inland Properties, although the largest tenant (Quest) does so, and K&K can expect to pay a commission if Quest renews the lease ending 1/31/2014. 8/29 Tr. 97-99. New tenants often use brokers, so if K&K signs any new tenants at the Inland Properties it will have to pay leasing commissions from the reserve account. 8/29 Tr. 98.

Finally, the budget includes no line item for collection loss. Spoerlein testified that she did not know what that term meant. 8/29 Tr. 101. After the term was explained to her, she stated that the budget did not include a line for collection loss "because we haven't had any tenants that are delinquent in quite some time." 8/29 Tr. 102, lines 14-15. However, tenant Enhanced Radiology incurred a significant delinquency at 5439 Durand during the Chapter 11 case and is now a holdover tenant being sued by K&K. 8/29 Tr. 84, 102-04. Tenant Gregory & Lai left 523-527 Old Northwest Highway before its lease expired. 8/29 Tr. 64, 102-03.

According to Spoerlein's budget, K&K's net cash flow at the end of 2013 would be $155,134. K&K Ex. 1 at 4.

<u>Plan Treatment</u>

Inland Bank holds a claim in the amount of $13,879,728.00. According to the plan, its allowed claim with respect to the Racine property is $3,259,159.00 and with respect to the other Inland Properties is $10,620,569.00. Plan at § 3.4(d)(ii). Inland elected to bifurcate its claim into secured and unsecured portions, and the parties stipulated that the value of the Inland Properties (and thus the amount of Inland's claim that is truly secured, as opposed to secured under the § 1111(b) election) is $9,170,000 (allocating $3,150,000 to Racine and $6,020,000 to the other properties). EOD 263.

[9]

K&K proposes to make payments on that $9.17 million secured claim over ten years with interest at 5.25%, on a 30 year amortization schedule. Monthly principal and interest payments will be $50,637. K&K Ex. 4 at Table 7. Inland will retain its liens on the Inland Properties as well as on the reserve account.

At the end of the ten year plan term, the full balance of Inland's claim will come due. K&K will pay the balance by "either refinanc[ing] the properties with a particular financial entity, whether it's a bank or a pension fund or what have you, with the assumption that the properties will be worth more in ten years versus what they're worth now. If that does not happen, another possibility will be to sell the properties and pay the Inland note off." 8/29 Tr. 161, lines 12 – 18. The balloon payment owed to Inland at the end of ten years will be approximately $7.8 million.

Kaldis' and Karagiannis' personal guarantees of the Inland claim will remain in place. Under the plan, neither owner will receive a distribution on account of their equity interest for one year. Although they may receive a distribution after the one year period expires, they "have never received a distribution from K&K since we've had K&K . . . . And we have no plans to do so going forward." 8/29 Tr. 193, lines 1-2 and 6-7.

Unsecured creditors will receive 50% of K&K's monthly profit. In 2014, that amount is forecasted to be $1,218 per month, and the monthly profit to K&K will be $1,218. **K&K Ex. 1**; 8/29 Tr. 176. Kaldis expects to receive only his salary of $117,000, and no owner draws or equity distributions. 8/29 Tr. 163-64.

## EXPERT TESTIMONY

### K&K's Expert – Daniel Van Vleet

K&K retained Daniel Van Vleet as an expert witness. Van Vleet is a managing director in the valuation and financial opinions group at Stout Risius Ross. He has worked in the valuation field for nearly 24 years and testified numerous times, including on behalf of Inland Bank's counsel in another bankruptcy case. 8/30 Tr. 198-99.

In order to determine the appropriate interest rate for K&K's plan, Van Vleet reviewed appraisal reports for the Inland Properties issued in 2012, interest rate indicators provided by various sources, interest rate yields on both investment grade and junk debt, and interest rates across a broad spectrum of securities. 8/30 Tr. 200. He also reviewed the proposed plan and the elements of Inland Bank's claim. 8/30 Tr. 209.

According to Van Vleet, Chicago real property values have been improving in the last year or so. 8/30 Tr. 205. "[W]hen you look at the general trends in this market, there is an expectation that vacancy rates are kind of continuing to decline and values will improve." 8/30 Tr. 208, lines 5-8.

Van Vleet first considered whether a market exists for the type of financing contemplated in the plan, and concluded that there is "really no real good, observable market data to be able to look to that would be consistent with the provisions of this plan." 8/30 Tr. 210, lines 13-16. In other words, K&K's debt to Inland Bank could not be refinanced on the open market. 8/30 Tr. 210-11. Since there were no appropriate market interest rates, Van Vleet decided not to use the "blended approach" in determining the appropriate interest rate for K&K's plan. In the blended approach,

> [y]ou would look at, typically, the collateral value of the property, and then you would assume a loan-to-value ratio that was consistent with market observations

[11]

on interest rates. You would look at first lien types of debt interest rates for conventional banks, and you would apply that loan-to-value ratio to this collateral value to determine what portion of that debt financing would be provided by conventional bank debt, and then you would apply that interest rate to that percentage of the capital provided by conventional bank debt.

You would then look at a second lien type of mortgage or broker asset equity position for the remainder of the loan-to-value ratio that wasn't covered by the conventional bank debt. And then you would look at market interest rates for that component, and then weight that interest rate according to the remainder of the loan-to-value ratio that wasn't covered by the bank interest -- the bank debt, I'm sorry.

8/30 Tr. 227, lines 17-25 – 8/30 Tr. 228, lines 1-11.

In addition to the lack of comparable market data, Van Vleet noted that Inland has a first lien position on the Inland Properties. There is no risk that Inland's secured position can be wiped out by another lienholder's foreclosure, unlike the holder of a second mortgage. 8/30 Tr. 230. Therefore, although Van Vleet has used the blended rate in other cases, he determined that it was not appropriate in this case.

In order to calculate the appropriate interest rate in this case, Van Vleet used the prime plus or formula method as described in the Supreme Court's <u>Till</u> decision.[5] This method starts with the prime rate (currently 3.25%) and makes a risk adjustment to that rate to reflect the factors that make the plan different from "what's typically included in a conventional lending situation." 8/30 Tr. 219, lines 10-11.

Van Vleet noted that the Supreme Court observed in <u>Till</u> that the usual risk adjustment to the prime rate is between 100 and 300 basis points, 8/30 Tr. 221, although he acknowledged that 300 basis points is not an upper limit, 8/30 Tr. 242. Van Vleet considered several factors in choosing the midpoint of the 100 to 300 basis point range as the appropriate risk premium:

- The Inland Properties experienced significant declines in the past 4 years and have likely reached their floor value;

---

[5] <u>Till v. SCS Credit Corp.</u>, 541 U.S. 465 (2004).

[12]

- The appraisal reports state that four of the five Inland Properties will increase in value from $6 million to $8.7 million by 2016;

- The fifth property could increase in value at an inflationary growth rate of 3%;

- The total projected value of all Inland Properties would be $12.1 million as of March 1, 2016 and, at an inflationary growth rate of 3%, would be over $15 million by July 15, 2023; and

- The properties are Class B in average condition.

K&K Ex. 4 at 14.

Although Van Vleet used only the prime-plus approach described in Till, he also reviewed commercial mortgage rates, K&K Ex. 4 at 12-13, and determined that the risk premium he proposed for this cramdown plan compared to commercial mortgage rates was similar to the risk premium added to junk or high-yield bonds compared to investment grade bonds. 8/30 Tr. 219-220. High yield or junk bond securities provide a yield premium between 20% and 40% to compensate for the risk investors take in foregoing the safer investment grade bonds. 8/30 Tr. 309. Van Vleet is not a commercial banker who has considered how to set a rate to a borrower based on the characteristics of collateral and creditworthiness. 8/30 Tr. 280.

Van Vleet then reviewed the positive and negative attributes of the plan. In his opinion, one positive attribute with regard to the plan's treatment of Inland is the potential for Inland to receive payments greater than the current value of its collateral. Van Vleet analogized this situation to a security with an equity kicker, "where the lender will agree to a lower interest rate on the bond if they get the upside potential of participating in the equity appreciation of the business over some time horizon." 8/30 Tr. 222, lines 9-12. The parties agreed that the value of Inland's collateral today is $9.17 million. If the Inland Properties appreciate over time, Van

Vleet points out that Inland will participate in that appreciation up to the full amount of its approximately $13.9 million claim.  8/30 Tr. 222.

Indeed, according to Van Vleet, "[i]t's almost inconceivable that [K&K] wouldn't be able to sell the properties and make the balloon payment at the end of ten years," 8/30 Tr. 258, lines 3-6, resulting in full payment to Inland.  Although he is not a licensed real estate appraiser, 8/30 Tr. 260, Van Vleet relied on the prospective valuations in the Summary Appraisal Reports prepared by Conn Valuation Group for four of the five Inland Properties.  K&K Ex. 4.  Each of those prospective valuations assumed that the particular property would be either 85% or 87.5% occupied at the time it stabilized.[6]  K&K Ex. 4 at 8-10.

| Property | Occupancy Rate at inspection March 2012 | Occupancy Rate August 15, 2013 K&K Ex. 1 at 9-13 | Projected Stabilized Occupancy Rate and Date |
|---|---|---|---|
| 215-217 S. Northwest Highway | 57% | 37.82% | 87.5% October 1, 2013 |
| 800 S. Northwest Highway | 73% | 55.04% | 85% April 1, 2013 |
| 523-527 Old Northwest Highway | 42% | 53.33% | 87.5% April 1, 2014 |
| 1050 Busse Highway | 51% | 52.56% | 85% March 1, 2016 |
| 5439 Durand Avenue | 80.9% *as of 8/14/12 | 82.55% | 85% No projection date |

The Appraisal Reports gave no opinion about the value of the Inland Properties ten years after the effective date of the plan.  Instead, Van Vleet relied on "market indications . . . that the commercial market in . . . Chicago in particular, is recovering. . . .  The trends look good at this point."  8/30 Tr. 274, lines 6-12.  "There may be some specific issues with vacancy rates on these

---

[6] According to Inland's expert, a stabilized property has a vacancy rate that is the same as "the average vacancy for those similar properties in your market."  8/30 Tr. 339, lines 18-20.

[14]

particular properties, but the general trends look positive relative to property values and vacancy rates." 8/30 Tr. 299, lines 12-15.

Even if the Inland Properties continue to appreciate, Van Vleet acknowledged that "there's a relatively high loan-to-value ratio, and . . . the borrower had some creditworth[iness] issues there." 8/30 Tr. 221, lines 13-14. Indeed, the loan-to-value ratio on the plan proposal is 151%. 8/30 Tr. 252. Additionally, the plan proposes a 10 year loan term at 30 year amortization, when a common 10 year commercial mortgage might fully amortize over that 10 year term. 8/30 Tr. 254-55. Van Vleet did not adjust upward for the vacancy rate at the Inland Properties, because he did not expect that above-market vacancy rate to continue. 8/30 Tr. 275-76.

However, Van Vleet decided that the positive and negative attributes of the plan balanced out, so that the midpoint of Till's suggested 100 to 300 basis point range would be an appropriate risk adjustment. This results in an interest rate of 5.25%. 8/30 Tr. 221.

In determining whether K&K would be able to make its monthly plan payments at a 5.25% interest rate, Van Vleet reviewed the cash flow forecast in the plan and the cash flow projections in the appraisal reports. K&K Ex. 4 at 15; 8/30 Tr. 283. He also talked with Kaldis for between one and two hours. 8/30 Tr. 283-84. Van Vleet did not visit the Inland Properties, review the leases, look at tax bills or make any adjustments to K&K's cash flow forecast. 8/30 Tr. 285-86. The $350,000 balance in K&K's operating account also provided Van Vleet with some comfort that if the Debtor failed to meet its occupancy projections it could continue to make its monthly plan payments of $50,637. 8/30 Tr. 225.

[15]

At Van Vleet's suggested interest rate of 5.25%, K&K would have net cash flow of $29,227 in 2014, resulting in a payment to unsecured creditors of $14,614 and leaving a cushion of $14,614. K&K Ex. 1 at 6.

Inland Bank's Expert – Mark Pikus

Inland Bank presented Mark Pikus as an expert witness. Pikus has worked exclusively in the field of commercial real estate finance, analyzing, underwriting and originating commercial real estate loans. He worked for Inland Bank for the past ten years, and recently moved to an affiliate, Inland Mortgage Investment Corporation, where he is a senior vice president, director of business development. Pikus' experience includes management at Inland High Leverage, a subsidiary that provides high leverage commercial real estate loans, primarily second mortgages. 8/30 Tr. 314-18, 386.

Pikus concluded that K&K's plan is not feasible, and that the appropriate cramdown interest rate would be 8.625%, with a 25 year amortization period. 8/30 Tr. 321; Inland Ex. 29 at 13. In formulating his opinion, Pikus reviewed the proposed plan, the leases, the 2011 and 2012 operating statements, the 2012 expense statement, K&K's monthly operating reports for March through June 2013 and the 2012 real estate tax bills. Inland Ex. 29 at 2. He also "looked at websites like RealtyRates.com. I looked at other second mortgage lenders to see what they would quote. I asked Inland Bank what they would quote." 8/30 Tr. 323, lines 3-6.

Pikus did not have CAM reconciliations to rely on, and although he was provided with rent rolls, he did not use them in formulating his opinion. 8/30 Tr. 327. "I actually started using my own rent roll, constructing my own rent roll because of errors. . . . I was finding errors from square footage amounts that were different, to rent amounts that were different. The rent rolls didn't even have CAM charges." 8/30 Tr. 327, lines 14-20. Error examples include:

[16]

- The rent roll for 1050 Busse Highway shows CAM/year of $1,500 for Reliance Global and $3,000 for Nolan Transportation. **K&K Ex. 1** at 12. But the leases have a base year of 2013 or 2014, which means those years are the starting point for CAM and no charges are assessed in those years. 8/30 Tr. 333-34.

- The rent roll for 523-527 Old Northwest Highway projects CAM income of $45,828. **K&K Ex. 1** at 3 and 11. But total occupancy (by tenants with leases rather than condominium owners) is 8,482 square feet, expenses are $7 per square foot, and the base year is $4.50 per square foot. Therefore, the amount of CAM that can be charged to tenants is $2.50 per square foot multiplied by 8,482, which is $21,205.[7] 8/30 Tr. 336.

- The rent roll for 5439 Durand projects CAM income of $185,262. **K&K Ex. 1** at 3 and 13. Since these are triple-net leases, all expenses can be billed back to the tenants. But total occupancy is 80%. With expenses of $200,000, the amount of CAM that can be charged to tenants is 80% or $160,000.

Therefore, Pikus constructed his own rent rolls from the leases. 8/30 Tr. 327.

In order to determine the appropriate cramdown interest rate, Pikus concluded that "it makes sense that you would just tranche it. You . . . would split them up into a first tranche where, you know, it's less risk, and then there's a second tranche that has more risk." 8/30 Tr. 365, lines 17-21. This was done hypothetically, however, because he "concluded that there is no identifiable market for the refinancing of a debt with the characteristics" of the loan Inland would hold through the plan. 8/30 Tr. 389, line 25 -- 8/30 Tr. 390, line 2.

Using this blended rate analysis, Pikus first assumed that a conventional lender would lend an amount equal to 50% of the property's value. An appropriate rate of interest for this tranche, similar to a first mortgage, would be 5.25%. He found support for this conclusion by reviewing the average interest rate for office properties at RealtyRates.com as well as using Inland Bank's current quotes for a 5 year term commercial office real estate transaction at 65%-70% loan to value. **Inland Ex. 29** at 12; 8/30 Tr. 323, 375-76.

---

[7] Pikus testified that the amount would be approximately $18,000. But 8,482 square feet x $2.50 per square foot = $21,205.

[17]

Pikus then assumed that a high-leverage lender would lend the remaining 50% of value between 10% and 13%. He assumed that this loan would be at 12%, based on the risk factors of this particular situation, despite the fact that Inland essentially has a first mortgage on all the real property. In making these assumptions, Pikus relied on his experience as a high-leverage lender as well as reviewing the website of another unconventional lender. **Inland Ex. 29** at 12.

To check his conclusion, Pikus calculated what he called a "build-up interest rate analysis." He found the following factors would warrant certain risk adjustments:

Loan to value of 100% (conventional is 65%-70%): risk adjustment of 1.50%. Inland's claim is $13.9 million, and the parties agreed that the value of the Inland Properties is $9.17 million.

Low occupancy: risk adjustment of 1.00%. The average occupancy for all five Inland Properties is 53%, and Pikus considered this to be a red flag. 8/30 Tr. 368.

Lease near term rollover: risk adjustment of 1.00%. For example, at 1050 Busse, 87% of the tenants are up for renewal in 2014.

Below 1.0x debt service coverage: risk adjustment of 1.00%.

10-year term: risk adjustment of 1.00%. The length of this loan asks the lender "to take a chance over ten years that nothing will change. And, therefore, they run the risk that their cost of funds go up and, you know, they will lose money." 8/30 Tr. 371, lines 19-22.

Short term leases and decreasing rental rates: risk adjustment of 1.00%. "[A] lot of the renewals were for one year, and then some of the new ones were like three years. So those short-term leases just add uncertainty and extra risk." 8/30 Tr. 373, lines 14-17.

These risk adjustments resulted in a total interest rate of 9.75%. **Inland Ex. 29** at 13.

Pikus used the prime-plus formula approach only as a check on his blended rate. The blended rate seemed more realistic to him. "That's what I see in the market that makes sense to me, that you would tranche the risks, because you really can't do a hundred percent financing like that." 8/30 Tr. 367, lines 9-12.

Pikus created a pro forma operating statement for the Inland Properties. Inland Ex. 29 at 6. On the income side, he used the rent rolls he created from reviewing the leases. He projected $1.146 million in rent while K&K projected $1.19 million, a relatively small difference. 8/30 Tr. 344. He also used his own CAM figures, which he calculated from reviewing the leases as well as four months of K&K's operating statements. 8/30 Tr. 330-31. Finally, Pikus included a line item of $69,717 at 5% of projected rent for vacancy collection loss, which represents the difference between the total amount tenants are supposed to pay and the actual amount collected.

For expenses, Pikus compared K&K's projections with the 2012 accrual expense figures, and "if reasonable, I would use actually the debtor's expense predictions." 8/30 Tr. 346, lines 19-20.

Indeed, Pikus used K&K's projections except in two areas. First, he used the actual tax bills to project the amount of taxes that would come due. 8/30 Tr. 347. K&K also did this in its amended projections. The other area in which Pikus used a different number was operational costs and management fee. In his opinion, the market rate for a management fee is 5%. 8/30 Tr. 348. In the end, his expense projections were very similar to K&K's. 8/30 Tr. 349.

Once he calculated net operating income by subtracting these expenses from income, Pikus included three other line items in his pro forma. First, he budgeted for replacement reserves. He used a figure of $0.25 per square foot for an annual total of $17,937, although after seeing the four Illinois Inland Properties, he thought that number might be too low. 8/30 Tr.

[19]

351-352.  Second, he budgeted for $102,500 in tenant improvements.  "[W]hether it's a new

tenant or a renewed tenant, they are going to have costs that they want you to spend as the

landlord to make their space nice."  8/30 Tr. 352, line 25 -- 8/30 Tr. 353, line 3.  He performed a

leasing rollover tenant improvements analysis in his report, assuming new 5 year leases and

concluding that the average annual tenant improvement cost would be $10 per square foot,

although the three new leases he reviewed that did list an amount associated with tenant

improvements the amounts were $20/square foot for two leases and $15/square foot for the third.

**Inland Ex. 29** at 8-9, 8/30 Tr. 404.  Finally, Pikus included a line item of $25,903 for leasing

commissions, because that's a standard item in his underwriting, whether or not borrowers

typically budget for it.  8/30 Tr. 357-58.  "You're underwriting a property to operate typical,

typical industry market, and in the market, you have to pay leasing brokers to get tenants."  8/30

Tr. 358, lines 21-23.

   According to Pikus, K&K will lose $605,685 in the first year after plan confirmation,

after making its plan payments to Inland Bank.  8/30 Tr. 362; **Inland Ex. 29** at 6.

   Pikus acknowledged that in his experience, when a borrower takes out a 5 year loan, it

does not have a commitment on the other end to refinance or fund a balloon payment, nor does it

have an offer to purchase in 5 years.  8/30 Tr. 416-17.

## CONCLUSIONS OF LAW

   K&K bears the burden of proving by a preponderance of the evidence that each of the

requirements of 11 U.S.C. § 1129 have been met.  In re American Consolidated Transportation

Companies, Inc., 470 B.R. 478, 486 (Bankr. N.D. Ill. 2012).  "Filing an objection does not shift

the burden away from the plan proponent that all requirements have been met."  Id.

[20]

11 U.S.C. § 1129(a)(8) requires each class of claims either to accept the plan or be unimpaired. Inland Bank, which is Class 4D, has not accepted the plan and is impaired, therefore the requirements of § 1129(a)(8) have not been met.

However,

> [I]f all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

11 U.S.C. § 1129(b)(1).

Pursuant to § 1129(b)(1), the Debtor may cram down the plan over Inland's objection if the plan does not discriminate unfairly, and is fair and equitable with respect to Inland. There is no issue regarding discrimination, but Inland objects to confirmation on the grounds that the plan is not fair and equitable, and thus does not satisfy § 1129(b)(1).

Second, Inland objects on the grounds that the plan is not feasible, which is a shorthand way of saying that it does not satisfy § 1129(a)(11): "Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . .".

Inland's third objection to confirmation was based on § 1129(a)(5)(B), which requires the plan to disclose "the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider." Inland did not address this objection in its post-hearing brief, and the Debtor agreed in its response to the confirmation objection that it would make any necessary modifications to the plan in order to disclose the salaries of Ellen Kaldis and Frank Kaldis. Therefore, the court considers this objection to be resolved.

[21]

Finally, Inland seeks to modify the automatic stay.  The parties agree that the Debtor has

no equity in the Properties.  Therefore, it is the Debtor's burden to show that the Inland

Properties are necessary to an effective reorganization.  11 U.S.C. §§ 362(d)(2)(B) and

362(g)(2).

### The Plan is Not Fair and Equitable With Respect to Inland Bank – 11 U.S.C. § 1129(b)(2).

#### K&K's Proposed Cramdown Interest Rate Does Not Provide an Appropriate Premium to Compensate Inland for its Risk

Inland first argues that the plan is not fair and equitable because K&K's proposed 5.25%

interest rate does not fairly compensate Inland for the risk it is taking in waiting for full payment.

According to Till v. SCS Credit Corp., 541 U.S. 465 (2004), the appropriate interest rate

in a cramdown plan is calculated using the "prime-plus formula."  The court starts with the prime

rate – currently 3.25% -- and then adds a premium to compensate the secured creditor for the risk

it must bear over the life of the plan.  This is the appropriate method of analysis where no

efficient market exists for what is essentially a loan from the secured creditor to the debtor.  Id. at

476 n. 14 ("when picking a cramdown rate in a Chapter 11 case, it might make sense to ask what

rate an efficient market would produce").

"Application of Till often involves competing expert opinions, and it is not unusual for a

bankruptcy court to heavily or completely discount one expert's opinion when determining the

appropriate interest rate."  In re Cottonwood Corners Phase V, LLC, 2012 WL 566426, *17

(Bankr. D.N.M. Feb. 17, 2012) (footnote omitted).  Even the expert that the court finds more

credible may not have all of his or her assumptions accepted by the court.  See Cottonwood, at

*18 ("For this reason, the Court does not make the requested risk adjustment of 1.5%."); In re

Griswold Bldg. LLC, 420 B.R. 666, 694 (Bankr. E.D. Mich. 2009) ("The Court gives greater

[22]

weight to Ferrell's testimony than to Maher's testimony. But that does not mean that the Court completely accepts each of the specific risk adjustments suggested by Ferrell.").

This court will conduct a two-step analysis, asking first whether an efficient market exists for this type of loan. "And, when no efficient market exists for a Chapter 11 debtor, then the Bankruptcy Court should employ the formula approach endorsed by the <u>Till</u> plurality." <u>Mercury Capital Corp. v. Milford Connecticut Assocs., L.P.</u>, 354 B.R. 1, 11 (D. Conn. 2006) (quotations and citations omitted).

According to Van Vleet, there is "really no real good, observable market data to be able to look to that would be consistent with the provisions of this plan." In other words, K&K's debt to Inland Bank could not be refinanced on the open market and the only appropriate method of analysis is the prime-plus formula. Pikus agreed that there was no identifiable market for a loan with these characteristics. The court finds no reason to disagree with the experts on this point. There is no efficient market for a loan of this size, length, amortization schedule or extreme loan-to-value ratio.

Although the experts agreed that no efficient market exists for a loan similar to the one created by the plan, they diverged in their approaches to the second step, which is the calculation of an appropriate rate of interest.

Despite Inland's assertion in its Objection to Debtor's Plan of Reorganization (EOD 210 at 8) that the prime-plus formula approach is the appropriate method for calculating an appropriate cramdown interest rate, its expert Pikus used the "band of investment" approach. Using this approach, also known as the "blended rate" approach, Pikus first assumed that a conventional lender would lend an amount equal to 50% of the property's value. An appropriate rate of interest for this tranche, similar to a first mortgage, would be 5.25%. He then assumed

that a high-leverage lender would lend the remaining 50% of value between 10% and 13%.

Pikus assumed that this loan would be at 12%, which resulted in a blended interest rate of

8.625%.

The court finds that the blended rate approach is not appropriate. The <u>Till</u> plurality

"expressly rejected methodologies that require the bankruptcy courts to consider evidence about

the market for comparable loans, noting that such approaches require an inquiry far removed

from such courts' usual task of evaluating debtors' financial circumstances and the feasibility of

the debt-adjustment plans." <u>In re Texas Grand Prairie Hotel Realty, LLC</u>, 710 F. 3rd 324, 336

(5th Cir. 2013) (quotations omitted) (approving 5% cramdown rate calculated under the prime-

plus method rather than 8.8% interest rate proposed by lender's expert under the blended-rate

approach). <u>Texas Grand Prairie</u> rejected the lender's expert opinion "that exit financing . . .

cobbled together through a combination of senior debt, mezzanine debt, and equity financing . . .

establishes 'efficient markets,' . . . it bears no resemblance to the single, secured loan

contemplated under a cramdown plan." 710 F. 3rd at 337 (footnote omitted) (citing <u>In re Am.

HomePatient, Inc.</u>, 420 F. 3rd 559 (6th Cir. 2005), <u>cert. denied</u>, 549 U.S. 942 (2006)). <u>Texas

Grand Prairie</u> acknowledged that the prime-plus formula is not "the only -- or even the optimal --

method for calculating the Chapter 11 cramdown rate," but it "has been endorsed by a plurality

of the Supreme Court, adopted by the vast majority of bankruptcy courts, and, perhaps most

importantly, accepted as governing by both parties to this appeal." 710 F. 3rd at 337.

The court will therefore calculate the cramdown interest rate under the prime-plus

approach. We begin with the prime rate of 3.25% and adjust accordingly based on the risk to be

borne by Inland during the term of the plan.

[24]

The <u>Till</u> plurality tells us that "[t]he appropriate size of that risk adjustment depends, of course, on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan." 541 U.S. at 479. "Additional risk factors to consider include the debt service coverage ratio, the loan-to-value ratio, and the quality of any guarantors." <u>In re 20 Bayard Views, LLC</u>, 445 B.R. 83, 111 (Bankr. E.D.N.Y. 2011) (quotation omitted). "Inadequate equity cushion and debt coverage are inherent financial risks when the cash flows are not absolutely certain. This is especially true . . . for the first three to four years of the plan when the Debtor's projections leave almost no room for the possibility that its underlying assumptions turn out to be less than exactly accurate." <u>In re Bloomingdale Partners</u>, 155 B.R. 961, 984-86 (Bankr. N.D. Ill. 1993) (a pre-<u>Till</u> case holding that "no magic formula" existed and finding a risk adjustment of 325 to 350 points to be appropriate by using the "band of investment" approach).

<u>Till</u> noted that many bankruptcy courts use a risk adjustment between 100 and 300 basis points. 541 U.S. at 480. Van Vleet chose the midpoint of 200 basis points, and in his report he stated that he relied on several factors in doing so. Although he listed six separate bullet points, those factors boil down to:

- The Inland Properties experienced significant declines in the past 4 years and have likely reached their floor value;

- The appraisal reports produced in 2012 indicate that four of the five Inland Properties will increase in value from $6 million to $8.7 million;

- At an inflationary growth rate of 3%, the value of all Inland Properties will be over $15 million by July 15, 2023; and

- The properties are Class B in average condition.

Van Vleet did not describe the adjustment he made for each of these factors, but simply concluded that an adjustment of 200 basis points should be added to the prime rate.

[25]

Van Vleet used the interest rate for investment-grade bonds and compared them with the interest rates available on junk bonds as a check on his work, finding that the yield premium the market demanded from the junk bonds investment was consistent with the risk adjustment he added to the prime rate.

This comparison begs the question of whether Van Vleet's assumption is valid, that is, whether junk bonds have the same relationship to investment grade bonds as the proposed treatment of Inland's debt has to a typical commercial mortgage. The court is not convinced that this relationship is a reliable check on Van Vleet's conclusion.

Moreover, Van Vleet's opinion that 200 basis points is the correct risk premium appears to be based on little more than choosing a midpoint between 100 and 300 basis points, the usual spread for risk premiums. He acknowledged a high loan-to-value ratio, 10 year loan term and 30 year amortization schedule, but decided that the positive and negative attributes of the plan essentially balanced out. Furthermore, the $350,000 balance in K&K's operating account that provided him with some comfort has declined to $238,808 as of December 31, 2013. In the court's opinion, Van Vleet's 200 basis point risk adjustment is too optimistic.

In order to determine a more appropriate risk premium, the court reviewed the adjustments suggested by Pikus in the prime-plus calculation he performed as a check on his blended rate analysis: loan to value of 100% (1.50%); low occupancy (1.00%); lease near term rollover (1.00%); debt service coverage ratio below 1.0 (1.00%); 10-year term (1.00%); and short term leases and decreasing rental rates (1.00%). Pikus' risk adjustments resulted in a total interest rate of 9.75%.

Additionally, the court reviewed risk adjustments determined by several other courts in Chapter 11 cramdown situations. See In re J.C. Householder Land Trust #1, 501 B.R. 441

[26]

(Bankr. M.D. Fla. 2013) (**1.75%** risk adjustment appropriate where debtor had excellent

payment history, substantial equity cushion, five year loan term followed by balloon payment, 25

year amortization, many years of management experience by the principal, pro forma based on

current rental numbers and expenses); In re LMR, LLC, 496 B.R. 410 (Bankr. W.D. Tex. 2013)

(risk adjustment of no more than **2.75%** appropriate where hotel was well-managed, recent

revenues exceeded projections, property was appreciating but in average condition, debtor had

cash to make upgrades and improvements during the life of the plan (including from an infusion

of equity), the plan was tight but feasible, and the hotel market and economy were rising); In re

GAC Storage El Monte, LLC, 489 B.R. 747 (Bankr. N.D. Ill. 2013) (Cox, J.) (premium of

**5.35%** appropriate to reflect risk of depressed rental and occupancy rates due to property's

location, interest rate risk for 7 year term, and lack of equity cushion); In re Greenwood Point,

LP, 445 B.R. 885, 918-919 (Bankr. S.D. Ind. 2011) (3% risk adjustment appropriate where debt

was fully collateralized, debtor's projections were conservative, reserves were maintained to

attract additional tenants and maintain the collateral, and the property was likely to appreciate);

Griswold Bldg., 420 B.R. at 694-696 (5% risk adjustment where plan required no equity

contributions and did not provide funds for tenant alterations or leasing commissions, 100% loan

to value, personal guarantees were limited, and projections were optimistic, resulting in a

significant risk of nonpayment especially as to balloon payment required in five years); In re

American Trailer and Storage, Inc., 419 B.R. 412 (Bankr. W.D. Mo. 2009) (**2.25%** risk

adjustment was appropriate where projections were realistic and had historical support, and

substantial equity cushion existed, but five year term, modifications to loan documents and

balloon payment added risk); In re Northwest Timberline Enterprises, Inc., 348 B.R. 412, 434

(**5.75%** risk adjustment was appropriate when secured creditor would be subordinated to taxing

[27]

authorities and new lender, and plan provided for 25 year amortization with a 7 year balloon); In re Prussia Associates, 322 B.R. 572, 591-92 (Bankr. E.D. Pa. 2005) (risk adjustment of **1.5%** appropriate where debtor's operations were improving and the value of the collateral was appreciating steadily).

Having reviewed the risk adjustments suggested by both experts in this case as well as those found to be most meaningful in the case law, the court concludes that a risk premium of 250 basis points should be added to the prime rate to determine the appropriate cramdown interest rate for this plan.

The key risk factors in this case are the 100% loan-to-value ratio, the 10 year plan term, a 30 year amortization schedule, K&K's recent history of short-term renewals and decreasing rent, and a continuing high vacancy rate at the Inland Properties.

Although Pikus would have added a risk premium of 650 basis points based on these and other factors, he did not reduce his proposed adjustment as a result of any positive indicators, and the court finds several. On the positive side of the balance sheet, Spoerlein was a credible witness for K&K. She appears to be a dedicated property manager, caring deeply about the Inland Properties as well as the tenants. The Inland Properties are in solid condition and Spoerlein is attentive to their repair and maintenance needs. Most of the tenants in the Barrington buildings have been there for many years. As Spoerlein testified, "they really like it. They're usually local. They live near the area. Seem to have a good clientele." Moreover, the tenants who left the Inland Properties during the Chapter 11 case, or did not renew, left for reasons that "had nothing to do with the location of the properties, the properties themselves, the maintenance."

[28]

Both Spoerlein and Kaldis believe that the market is improving. However, even Van Vleet acknowledged that while general market trends indicate that property values are likely to increase, there may be specific problems at these particular properties. It may be that vacancy rates in the Chicagoland area are on the decline, but a Class B or C property in average condition with no promotion budget is less likely to float upward with the rising tide. Therefore, the court declined to guess whether the real estate market will continue to improve or whether the Inland Properties will benefit from any such improvement. The future of the rental market in Barrington, Racine and Bensenville did not affect the court's risk premium analysis one way or another.

Neither did the question of whether Inland's allowed secured claim should be reduced by the adequate protection payments made since the petition date, as K&K asserts. First, the court finds more persuasive the authority cited by Inland for the proposition that "the payments from assigned rents should not be applied to the real property secured claim. Rather, the payments reduce the creditor's unsecured deficiency claim by satisfying the portion of the claim that is secured by the assignment of rents." 3 Collier on Bankruptcy ¶ 361.03[2][a] (16th ed. 2013). Therefore, any reduction to Inland's total allowed claim would have an effect only on the amount of the balloon payment, the feasibility of which is discussed in the section below. Secondly, any such reduction of Inland's claim is not included in the proposed plan. According to the plan, Inland's claim is $13,879,728.00.

Finally, Van Vleet testified that if K&K successfully completes the plan, Inland will receive the equivalent of a security with an equity kicker, "where the lender will agree to a lower interest rate on the bond if they get the upside potential of participating in the equity appreciation of the business over some time horizon." The value of Inland's collateral is approximately $9.17

million, but if the property appreciates over time and supports the full balloon payment, Inland

will participate in that appreciation up to the full amount of its approximately $13.9 million

claim. As K&K explained in its Post-Trial Brief in Support of Confirmation, "Inland's risk is

reduced by any realized appreciation in the value of the Inland Properties. . . . Through the

increased value of its liens, Inland will reap the benefit of any appreciation of the properties."

Debtor's Post-Trial Brief at 13. K&K argues that this reduced risk should correspondingly

reduce the risk adjustment to the cramdown interest rate.

 This argument does not hold water. Inland appropriately points out that the election

under § 1111(b)(2) to have its entire claim treated as secured does not result in a bonus.

> The purpose of the section 1111(b)(2) election is to provide additional protection
> to a partially secured creditor when the secured creditor believes that . . . the
> treatment accorded unsecured creditors under section 1129(b)(2)(B) is so
> unattractive that the electing creditor is willing to waive its unsecured deficiency
> claim. It comes, however, at the cost of relinquishing any deficiency claim.

7 Collier on Bankruptcy ¶ 1111.03[4] (16th ed. 2013). Inland released its unsecured claim in

exchange for taking the risk that when the balloon payment is made 10 years from now, its entire

claim would be paid in full. As Inland wrote, "[a]ny amount that Inland Bank receives above the

$9.17 million is not a premium, as in the case of an equity kicker – instead, it simply pays down

debt actually loaned by and owed to Inland Bank." Inland Bank and Trust's Post-Hearing Brief

at 9.

 For all of these reasons, the court finds that a risk premium of 250 basis points is

appropriate, resulting in a cramdown interest rate of 5.75%.

<u>A Cramdown Interest Rate of 5.75% Results in Negative Amortization, Which is Not Fair and
Equitable With Respect to Inland Bank</u>

 K&K provided in the plan for the possibility that this court will require an interest rate

higher than 5.25%. "In the event the Court-Approved Interest Rate is utilized and it exceeds

[30]

[5.25%] per annum, at the Debtor's option, the difference between the [5.25%] interest payment

and the Court-Approved Interest Rate payment may be added to the balance of the balloon

payment(s) at the end of the term as opposed to being paid as part of the monthly installments."

Plan at § 3.4(d)(v)(1) and § 3.4(d)(v)(2). In other words, an interest rate above 5.25% will result

in negative amortization.

> Negative amortization refers to a provision wherein part or all of the interest on a secured claim is not paid currently but instead is deferred and allowed to accrue, with the accrued interest added to the principal and paid when income is higher. The extent of negative amortization depends upon the difference between the "accrual rate," or the overall rate of interest to be paid on a claim, and the "pay rate," or the rate of interest to be paid on a monthly basis. Even when a debtor defers payments of interest on its debt obligation, the deferred amount can be capitalized at a rate of interest which enables the deferred amount to equal the present value of the creditor's allowed secured claim.

Great Western Bank v. Sierra Woods Group, 953 F. 2nd 1174, 1176 (9th Cir. 1992) (citations and

quotation omitted). "Negative amortization plans are not barred per se. But they are viewed

with suspicion. Courts judge them on whether they are fair and equitable by assessing the risk

they place on the creditor who is not receiving principal and interest payments." In re Sunflower

Racing, Inc., 219 B.R. 587, 603-604 (Bankr. D. Kan.) (footnote omitted), aff'd, 226 B.R. 673 (D.

Kan. 1998). Ten factors are reviewed:

> 1. Does the plan offer a market rate of interest and present value of the deferred payments;

> 2. Is the amount and length of the proposed deferral reasonable;

> 3. Is the ratio of debt to value satisfactory throughout the plan;

> 4. Are the debtor's financial projections reasonable and sufficiently proven, or is the plan feasible;

> 5. What is the nature of the collateral, and is the value of the collateral appreciating, depreciating, or stable;

> 6. Are the risks unduly shifted to the creditor;

> 7. Are the risks borne by one secured creditor or class of secured creditors;

[31]

8. Does the plan preclude the secured creditor's foreclosure;

9. Did the original loan terms provide for negative amortization; and

10. Are there adequate safeguards to protect the secured creditor against plan failure.

In re Apple Tree Partners, L.P., 131 B.R. 380, 398 (Bankr. W.D. Tenn. 1991) (footnote omitted).

Since the court has found that the appropriate risk premium is 250 basis points and that the cramdown interest rate must be 5.75%, K&K will have to defer at least some of the interest due to Inland Bank.  Is this fair and equitable to Inland Bank?  After a review of the factors enumerated in Apple Tree Partners, it is clear that such treatment is not fair and equitable.

(1) The plan will offer a Court-Approved Interest Rate, and will pay the present value of the deferred payments in the balloon payment at the end of the 10 year term; (2) Inland will have to wait 10 years for full payment.  Courts that have confirmed plans with negative amortization generally allow much shorter terms.  See In re Wood, 1991 WL 332637, *6-7 (W.D. Va. Nov. 11, 1991) (four years plus oversecured creditor); In re Good, 413 B.R. 552 (Bankr. E.D. Tex. 2009), aff'd, 428 B.R. 249 (E.D. Tex. 2010) (three years); In re Deluca, 1996 WL 910908, *16 (Bankr. E.D. Va. April 15, 1996) (plan was not feasible but two months' deferral would have been reasonable).  K&K did the math under a hypothetical 6% Court-Approved Interest Rate, and $495,720 would be added to the balloon payment.  The amount added to the balloon payment at an interest rate of 5.75% will be lower than that, but still results in a higher number than $7,803,278; (3) The ratio of debt to value is not satisfactory.  Inland's claim is approximately $13.9 million and the parties agreed that the value of the Inland Properties is $9.17 million.  Compare In re Windwood Heights, Inc., 385 B.R. 832, 840-41 (Bankr. N.D.W. Va. 2008) (finding negative amortization plan "patently unconfirmable" based on eight-year negative amortization schedule with no interim payments but acknowledging that "[g]iven the

[32]

substantial equity cushion in this case, it is not out of the realm of possibility that the court could

approve of a negative amortization plan" on a more accelerated timetable); (4) A discussion of

feasibility, including commentary on K&K's projections, is in the next section; (5) The nature of

the collateral is five commercial office buildings. Their value is not depreciating, but neither are

the properties at a stabilized occupancy level; (6) Inland bears the risk of failure. K&K's

principals will invest no new equity and are free to take distributions after the first year. Kaldis

will continue to receive his current salary of $117,000; (7) The risk of nonpayment is borne only

by Inland; (8) The plan precludes Inland from foreclosure. It also eliminates the prepayment

penalties in the original loan documents and extends the original 25 year amortization schedule

to 30 years; (9) The original loan terms did not provide for negative amortization; and (10) No

safeguards to protect Inland against plan failure have been identified to the court.

In light of the issues identified above, the court finds that the negative amortization that

would be the result of the 5.75% cramdown interest rate is not fair and equitable with respect to

Inland Bank.

**Confirmation of the Plan is Likely to be Followed by the Liquidation, or the Need for Further Financial Reorganization, of the Debtor – 11 U.S.C. § 1129(a)(11).**

Having found that the plan is not fair and equitable with respect to Inland Bank, it is

unnecessary to make further findings as to whether the plan meets the requirements for

confirmation. However, Inland also objected to confirmation on the grounds that the plan is not

feasible, and in the event the parties wish to reach a negotiated resolution following issuance of

this opinion, the court's findings on feasibility may be helpful.

The test in the Seventh Circuit for determining whether confirmation of the plan is not

likely to be followed by the liquidation or need for further financial reorganization of the debtor

was set forth in <u>Matter of 203 N. LaSalle Street Partnership</u>: "In determining that the plan was

[33]

feasible, the bankruptcy court need not find that it is guaranteed to succeed; only a reasonable

assurance of commercial viability is required." 126 F. 3rd 955, 961-62 (7th Cir. 1997) (citations

and quotations omitted), overruled on other grounds, Bank of America Nat. Trust and Sav. Ass'n

v. 203 North LaSalle Street Partnership, 526 U.S. 434 (1999). "A plan need not be assured of

success to be confirmed." Id. at 962.

> [A] plan meets the feasibility standard only if it "offers a reasonable prospect of
> success and is workable." The central inquiry is "whether there is a reasonable
> probability the provisions of the plan can be performed." Furthermore,
> "[s]incerity, honesty and willingness are not sufficient to make the plan feasible,
> and neither are visionary promises." Rather, the feasibility test "is firmly rooted in
> predictions based on objective facts." A Fifth Circuit Opinion stated that
> "[w]here the projections are credible, based upon the balancing of all testimony,
> evidence, and documentation, even if the projections are aggressive, the court
> may find the plan feasible. Debtors are not required to view business and
> economic prospects in the worst possible light.". . . "The test is whether the
> things which are to be done after confirmation can be done as a practical matter
> under the facts."

In re Olde Prairie Block Owner, LLC, 467 B.R. 165, 169-70 (Bankr. N.D. Ill. 2012) (citations

omitted).

As stated above, the burden of proof on the question of feasibility lies with the plan

proponent, who must demonstrate that the plan is feasible by a preponderance of the evidence.

In re Briscoe Enters., Ltd., II, 994 F. 2nd 1160 (5th Cir.), cert. denied, 510 U.S. 992 (1993).

The key question in making this determination is whether K&K's projections are

reasonable. For a number of reasons, the court finds that K&K failed to demonstrate that its

projections support a reasonable assurance of commercial viability.

Since the petition date, the five Inland Properties suffered a net decrease in revenue.

Although Spoerlein testified there has been a wash between departing and arriving tenants, K&K

actually suffered a net loss in annual base rent of approximately $131,000. The one potential

tenant listed in the budget, MB Financial, has a one month abatement for each year of its lease

[34]

term. Having to make this type of rent concession does not bode well for K&K's future

performance.

Moreover, K&K is very dependent on one tenant, Quest Diagnostics, which occupies

more than 15% of the total rentable square footage and accounts for approximately 20% of the

rental revenues. When its lease expired last year, Quest signed only a one year renewal, through

January 31, 2014, at an annual decrease in rent of $46,363.19. Although Quest's broker

approached K&K about renewal terms and verbally committed to at least one more year, there

was nothing in writing at the time of the evidentiary hearing. Quest's $28,571.13 <u>monthly</u> rent is

nearly equivalent to the $29,227 net <u>annual</u> cash flow that K&K projects for 2014. Losing Quest

as a tenant would be devastating to K&K and back-to-back one year renewals do not support the

image of a committed tenant.

When Spoerlein created a budget, she increased expenses by three percent because

"[t]hat's pretty much what we've been seeing across the board over the last couple years, is a

three percent increase." This appears reasonable to the court, as does her assumption that

income will remain the same from 2013 to 2014, even though some of the tenants have stepped-

up rents at the anniversary of their lease signing. Spoerlein wisely ignored those step-ups

"because there are other times when we renew some of these tenants as is, or sometimes they

would like a little bit of a reduction in rent." She acknowledged the fact that "there's been such a

change, unfortunately, as far as landlords go. We're having to give a lot more concessions.

There's more properties out there for tenants to choose, so we need to give them some incentive

to renew."

There are four items missing from the budget, however, which call the accuracy of the

projected expenses into question:

- <u>Vacancy collection loss</u>. This represents the difference between the total amount tenants are supposed to pay and the actual amount collected. Pikus assumed a 5% collection loss, which would total $69,717 annually. Spoerlein initially testified that she did not know the term "vacancy collection loss." The court finds it difficult to believe that a 35 year veteran of the real estate business would not understand that sometimes tenants pay late, fail to pay, or break their lease. Such an answer calls the soundness of her budget into question.

- <u>Replacement reserves</u>. Pikus used a figure of $0.25 per square foot, although after seeing the four Inland Properties in Illinois, he thought that number might be too low. The annual total in Pikus' expenses is $17,937. Indeed, K&K paid $14,003 to Swenson Sealcoat, Inc. for "parking lot repairs sealcoating" in October 2013.

- <u>Tenant improvements</u>. Spoerlein testified that following industry practice, K&K would include the cost of improvements in the rental rate and amortize it over the lease term. Nevertheless, K&K must still pay for any improvements up front. Moreover, of the last 11 lease renewals, 10 were at the same or a decreased rental rate. Finally, Pikus concluded that the average annual tenant improvement cost would be $10 per square foot. This may even be too low, since in the three new leases Pikus reviewed that listed an amount associated with tenant improvements, the amounts were $20/square foot for two leases and $15/square foot for the third. Pikus' budget includes $102,500 for tenant improvements.

- <u>Leasing commissions</u>. Renewing tenants rarely use brokers at the Inland Properties, although Quest does so, and K&K can expect to pay a commission if Quest renews the lease ending January 31, 2014. New tenants often use brokers, so if K&K signs any new tenants at the Inland Properties it will have to pay leasing commissions. Pikus budgeted $25,903 for leasing commissions.

Spoerlein testified that any and all of these expenses can be paid from the reserve account, which contained $350,394 as of August 31, 2013. But by December 31, 2013, the balance in the account was $238,808.53, a decline of more than 30% in four months. This does not give the court confidence that the reserve account is the cushion or backup that K&K imagines it to be. The budget that Spoerlein prepared has a razor-thin margin of error even at an interest rate of 5.25%. Annual net cash flow in 2014, according to her projections, will be $29,227 on total revenue of $1,570,227, and in 2015 it will decline to $28,553 at the same revenue. Moreover, half of all net cash flow is earmarked for unsecured creditors. While the

reserve account can serve as a backstop for a time, any unforeseen expenses or declines in

revenue would eventually be fatal even if the budget were 100% accurate.

A great deal of time was devoted at trial to the reimbursement that K&K expects from its

tenants for CAM charges. At the time of the evidentiary hearing, K&K had not yet calculated

the reimbursement due for 2012 CAM, and based on the 2011 CAM collections, Spoerlein

estimated that 2012 CAM reimbursement would be approximately $65,000. Much was made of

the fact that K&K's expenses are lower than they were in 2011, so Inland argued that 2012 CAM

must also be lower. However, Inland failed to connect reduced overall expenses to a reduction in

the expenses that are reimbursed by the tenants.

Inland did establish the following discrepancies in K&K's budgeted CAM revenues:

- The rent roll for 1050 Busse Highway shows CAM/year of $1,500 for Reliance Global
  and $3,000 for Nolan Transportation. But the leases have a base year of 2013 or 2014,
  which means those years are the starting point for CAM and no charges would be
  assessed in those years. This error results in an overstatement of CAM by $4,500.

- The rent roll for 523-527 Old Northwest Highway projects CAM income of $45,828. But
  total occupancy (by tenants with leases rather than condominium owners) is 8,482 square
  feet, expenses are $7 per square foot, and the base year is $4.50 per square foot.
  Therefore, the amount of CAM that can be charged to tenants is $2.50 per square foot
  multiplied by 8,482, which is $21,205. This error results in an overstatement of CAM by
  approximately $24,600.

- The rent roll for 5439 Durand projects CAM income of $185,262. Since these are triple-
  net leases, all expenses can be billed back to the tenants. But total occupancy is 80%.
  With expenses of $200,000, the amount of CAM that can be charged to tenants is 80% or
  $160,000, rather than $185,262. This error results in an overstatement of CAM by
  approximately $25,000.

All together, K&K's projected CAM charges may be nearly $50,000 too high.

The final question with regard to K&K's projections and the ultimate success of its plan

hinges on K&K's ability to make a balloon payment to Inland Bank ten years after confirmation.

Inland argues that K&K failed to prove, by a preponderance of the evidence, that there is a

reasonable probability it will be able to do so. See GAC Storage El Monte, 489 B.R. at 757 (it is

debtor's burden "to present credible evidence to the Court demonstrating that the balloon

payment will likely be made by the Plan's maturity date.").

Inland argues that K&K presented no evidence that it had a financing commitment in

place, or a buyer for the Inland Properties, when the loans proposed in the plan mature in ten

years. This is not a serious concern for the court. It is unreasonable to expect a debtor to secure

financing or a buyer for a transaction that will not occur for ten years.

The proposed balloon payment is $7,803,278. At the 5.75% cramdown interest rate, the

payment will be higher than this proposed payment. The parties agree that the Inland Properties

are worth $9.17 million today. However, K&K presented no evidence regarding the projected

value of the Inland Properties in ten years, and whether that value would support a refinancing or

sale that could take out Inland's loan.

It was Van Vleet's opinion that the Inland Properties will increase or maintain their value

during the ten year plan term, but he is not a licensed real estate appraiser. His opinion on the

future value of the Inland Properties was based solely on the prospective valuations in the

Summary Appraisal Report prepared by Conn Valuation Group for four of the five Inland

Properties.[8]

But at least two of the projected valuations were shown to be flawed by the time of the

confirmation hearing. The appraiser – who never testified, but whose conclusions were simply

repeated in Van Vleet's report – projected a stabilized occupancy rate of 85% for 800 S.

Northwest Highway by April 1, 2013. However, two weeks before the evidentiary hearing, on

August 15, 2013, its occupancy rate was 55.04%. The appraiser also projected that 215-217 S.

Northwest Highway would reach a stabilized occupancy rate of 87.5% by October 1, 2013. On

August 15, 2013, the occupancy rate at that building was 37.82% and no new tenants were in the

---

[8] The Appraisal Report was not introduced into evidence, although Van Vleet testified about it.

pipeline. While occupancy rates do not necessarily equal value, failure to meet the projected

stabilized occupancy rate – or to even come close – undercuts the validity of the appraiser's

projections and, consequently, Van Vleet's opinion that the Inland Properties will support a sale

or refinancing that covers the balloon payment.

Moreover, the Appraisal Report gave no opinion about the value of the Inland Properties

in ten years. Instead, Van Vleet relied on "market indications . . . that the commercial market in .

. . Chicago in particular, is recovering. . . . The trends look good at this point." Van Vleet

expected that the value of the Inland Properties would increase over time, despite the relatively

high vacancy rate. When asked whether the current vacancy rates affected his expectation when

compared to the appraiser's stabilized vacancy rates, Van Vleet answered in the negative because

the general trend was a declining vacancy rate. In the very next statement, however, he undercut

his expectation: "There may be some specific issues with vacancy rates on these particular

properties, but the general trends look positive relative to property values and vacancy rates."

General trends are much less convincing to the court than specific evidence regarding

these five pieces of real estate. See In re 210 Ludlow Street Corp., 455 B.R. 443, 450 (Bankr.

W.D. Pa. 2011) ("He did refer to some industry wide trends for the Northeastern area of the

country to provide a justification for his assumptions, but, in the Court's mind, those trends

should not obscure the fact that what is being valued in a specific hotel, in a specific location.").

And the specific evidence before the court paints a picture of properties that are neither

stabilizing nor increasing in value. K&K introduced no evidence to support a finding that the

vacancy rates at these properties will improve immediately after confirmation and eventually

stabilize. There was no evidence of management efforts to find new tenants.

Despite Van Vleet's testimony that "[i]t's almost inconceivable that [K&K] wouldn't be able to sell the properties and make the balloon payment at the end of ten years," K&K presented no credible evidence to support this conclusion other than the belief that we are now in a recovering real estate market. Compare In re VDG Chicken, LLC, 2011 WL 3299089, *6 (B.A.P. 9th Cir. April 11, 2011) ("[T]here was testimony that, in a normal market, lenders would compete to do business with Debtor because the long-term Tenant's business was profitable and stable. Therefore, the bankruptcy court found that it could reasonably infer that the proposed balloon payment would be made through a refinancing of the Bank Loan or sale of the Property. The finding is supported by the evidence in the record, and is neither implausible nor illogical."); with Griswold Bldg., 420 B.R. at 709 ("The evidence shows that the Debtors have properties worth at most $20 million, that they somehow hope will have sufficient value in five years to enable them to pay $36.5 million to the Lender. The evidence does not establish that it is more likely than not that the Debtors will make these payments.").

Finally, the court notes that while Kaldis' and Karagiannis' personal guarantees of the Inland claim will remain in place, no evidence was introduced regarding the value of those guarantees. The existence of the guarantees was of no value in determining whether the plan is feasible.

For all of the reasons stated above, K&K's projections do not support a reasonable assurance of commercial viability. The court finds that the plan is not feasible, and that confirmation of the plan is likely to be followed by the liquidation or need for further financial reorganization of the debtor.

[40]

## CONCLUSION

Having considered all of the evidence presented as well as the arguments in the briefs and in open court, for all of the reasons stated above, the court declines to confirm K&K's plan. The plan is not feasible, and it is not fair and equitable with respect to its treatment of Inland Bank. The objection to confirmation is sustained.

The court will hold a status hearing on **March 6, 2014, at 10:30 a.m.** At that time the parties will report on the status of any amended plan and the court will determine whether Inland's motion for relief from stay should be granted.

Date:    **FEB 1 3 2014**                                   
PAMELA S. HOLLIS
United States Bankruptcy Judge